CRANDAL v. ACCIDENT INS. CO. OF N. A.

*(Circuit Court, N. D. Illinois. March, 1886.)*

1. ACCIDENT INSURANCE—POLICY—DEATH FROM HANGING.
   Death from hanging, when the insured is insane, is a death effected through external, accidental, and violent means, within the meaning of a policy of accident insurance.

2. SAME—DEATH NOT CAUSED BY BODILY INFIRMITY OR DISEASE.
   The policy in this case provided that the insurance should not extend to death or disability "which may have been caused wholly or in part by bodily infirmities or disease." *Held,* that within the intent of the contract, and the meaning of the law, the death was caused, not by bodily infirmity or disease, but by the act of self-destruction.

At Law.
*House, Fry & Babb,* for plaintiff.
*Thomas Bates,* for defendant.

DYER, J. On the twenty-third day of May, 1884, the defendant company issued to Edward M. Crandal, since deceased, an accident

policy of insurance, by which it promised to pay to the plaintiff, who was the wife of the insured, the sum of $10,000, within 30 days after sufficient proof that the insured, at any time within the continuance of the policy, had sustained bodily injuries, effected through external, accidental, and violent means, within the intent and meaning of the contract, and the conditions thereunto annexed, and such injuries alone had occasioned death within 90 days from the happening thereof. It was provided in the policy that the insurance should not extend to death or disability "which may have been caused wholly or in part by bodily infirmities or disease." Further, that no claim should be made under the policy if the death or injury should be caused by suicide or self-inflicted injuries.

While this policy was in force, the insured, Edward M. Crandal, took his own life by hanging, and the jury to whom the case was submitted for a special verdict on the facts, has found that at the time of the act of self-destruction he was insane. The question reserved for consideration by the court, and now to be determined, is whether the death was one covered by the policy. The question of liability, as it here arises, upon an accident policy of insurance, seems to be one of first impression. Unaided by direct authority, the court is called on to determine, *first*, whether, under such a policy as this, death from self-destruction, occurring when the insured is insane, may be said to have been caused by bodily injuries effected through accidental means. This question, it will be understood, is here to be considered quite independently of the question whether disease or physical infirmity was a promoting cause of death.

The verdict of the jury was unquestionably right. The case was one in which the evidence clearly established the fact of insanity. The symptoms of a disordered mind were manifested in the countenance, conduct, and conversation of the insured. He was sleepless, was sometimes unduly excited, then unnaturally depressed. He suffered to such an extent from melancholy that he abandoned his accustomed habits and pursuits. Fondness for family and friends changed to indifference; and, in short, his reasoning powers and self-control appear to have been prostrated by the fear of want and by morbid impulses and delusions, such as, in this species of insanity, impel to self-destruction. Upon the facts shown, the jury might well find that his judgment, his volition, his will, were overthrown, so that, in the language of Mr. Justice NELSON, when chief justice of New York, in the case of *Breasted* v. *Farmers' Loan & Trust Co.*, 4 Hill, 73, 75, the act of suicide "was no more his act, in the sense of the law, than if he had been impelled by irresistible physical power."

Upon the verdict and the facts which sustain it, it may then be assumed that when the deceased took his life it was not his voluntary, rational act. He could not exercise his natural powers of volition, and thereby control his judgment upon the act he was about to commit. The physical violence, therefore, which terminated his life

was the same as if it had come upon him from sources outside of himself, and for which he was not responsible. It was force emanating, not from the brain and hand of Edward M. Crandal, as a responsible, voluntary agent, but force which was uncontrollable, so far as he was concerned. The means employed to produce death were external and violent. Were they not also, in a just and true sense, accidental, if the deceased was so far bereft of his reasoning faculties that his act was not the result of his will, or of a voluntary operation of his mind? If, in consequence of his condition of irre-sponsibility, the violence which he inflicted upon himself was the same as if it had operated upon him from without, then why was not the death an accident within the definition of that term as given by Bouvier, namely: "An event which, under the circumstances, is unusual and unexpected by the person to whom it happens; *the happening of an event without the concurrence of the will of the person by whose agency it was caused ?*"

No case has been cited where the question, as here presented, was directly in judgment, but there are *dicta* which afford some aid in reaching a conclusion. In 7 Amer. Law Rev. 587, 588, various definitions of an accident, as the term is used in insurance policies, are given, namely:

"An accident is 'any event which takes place without the oversight or expectation of the person acted upon or affected by the event.' *Ripley* v. *Railway Passengers' Assur. Co.*, 2 Bigelow, Cas. 758; *Providence Life Ins. Co.* v. *Martin*, 32 Md. 310. It is 'any unexpected event which happens as by chance, or which does not take place according to the usual course of things.' *North American Ins. Co.* v. *Burroughs*, 69 Pa. St. 43. 'It is something which takes place without any intelligent or apparent cause; *without design, and out of course.' Mallory* v. *Travelers' Ins Co.*, 47 N. Y. 52. 'Some violence, casualty, or *vis major* is necessarily involved' in the term accident. It means, in short, in insurance policies, an injury which happens by reason of some violence, casualty, or *vis major* to the assured, without his design or consent, or voluntary co-operation."

Similar definitions are given by Mr. Justice PAINE in his discussion of the question in *Schneider* v. *Insurance Co.*, 24 Wis. 30.

In *Scheiderer* v. *Insurance Co.*, 58 Wis. 14, S. C. 16 N. W. Rep. 47, it was alleged in the pleading that while the insured, who was traveling in a railway car, "*was in a dozed and unconscious condition of mind, and not knowing or realizing what he was doing,*" he *involuntarily* arose from his seat, and walked unconsciously to the platform of the car, and fell therefrom to the ground; and it was held that this constituted a good cause of action upon a policy of accident insurance. Here, it is true, the injury resulted from falling from the car; but since the moving cause was the *involuntary act* of leaving the seat and walking to the platform, the case suggests the inquiry, if, for example, a person in a fit of somnambulism, or in delirium, *not knowing or realizing what he is doing*, involuntarily inflicts injury upon himself,—that is, by means of his own hand,—and death en-

sues, is not such an injury as much the result of accident as if, in the same circumstances, the injury results from other external forces, such as falling from the platform of a moving train ?

In *Hill* v. *Insurance Co.*, 22 Hun, 189, the insured took poison by mistake, and died suddenly. The court said that death occurred through accidental means. The taking of the poison was not the result of the will or intention of the person, and was therefore not his voluntary act. It was adjudged, however, that the plaintiff could not recover, on the ground that the policy contained a clause that the company should not be liable if death should be caused by taking poison; and this clause was held to exempt the company from liability, whether the poison was taken intentionally or by mistake.

In *Pierce* v. *Travelers' Ins. Co.*, 34 Wis. 395, Mr. Chief Justice Dixon, speaking for the court, in interpreting the clause in the policy in question in that case, referred to instances of death resulting from an act committed under the influence of delirium,—as if the person should, in a paroxysm of fever, precipitate himself from a window, or, having been bled, remove the bandages, or should take poison by mistake,—and observed that deaths thus produced "are more properly denominated deaths by accident than deaths by suicide. * * * Deaths so caused are held to be deaths by accident, within the meaning and purpose of policies of insurance against accident; as where a man negligently draws a loaded gun towards him by the muzzle, or the servant fills the lighted lamp with kerosene, and the gun is discharged and the lamp explodes."

In *Horn* v. *Life Ins. Co.*, 7 Jur. (N. S.) 673, the court, in passing upon the question whether a policy of insurance upon life is rendered void by the suicide of the insured when insane, speaks of such a death as just as much an accident as if the insured had fallen from the top of a house.

In *Breasted* v *Farmers' L. & T. Co.*, 8 N. Y. 306, it was observed by the court that "a death by accident, and a death by the party's own hand, when deprived of reason, stand, on principle, in the same category. In both cases the act is done without a controlling mind."

To maintain the position that because his own hand constituted the violent means employed by the insured in taking his life, those means were not external and accidental, it is necessary to take a distinction between force emanating from the insane person himself and force operating independently from without. I can hardly think there is ground for such a distinction. The injury and the death seem equally fortuitous in both cases, for in neither case is there a concurring will which prompts the act. An insane man burns his own insured property. The insurer is nevertheless liable for the loss unless its contract expressly exempts it from liability, even in case of such a burning; this for the reason that the act was not voluntary, or done with the assent, procurement, or design of the assured as a

rational person. *Karow* v. *Continental Ins. Co.*, 57 Wis. 56; S. C. 15 N. W. Rep. 27. Although, in the darkness that enveloped his mind, the hand of Edward M. Crandal adjusted the fatal noose, the act was no more attributable to his voluntary agency than if, as a sane man walking the street in the darkness of night, the same fatality, without co-operation on his part, or even consciousness of danger, had overtaken him. Therefore it would seem that, in the one case as in the other, the death would be attributable to casualty.

Additional force is given to this view of the question when we consider that in cases arising upon life insurance policies, decided by the supreme court of the United States, it has been repeatedly held that if the insured, while in the possession of his ordinary reasoning faculties, from any motive intentionally takes his own life, such death is within the proviso on the subject of suicide, and the insurer is not liable. On the contrary, if the insured takes his life when insane, then the death cannot be said to be "by his own hand," and the insurer is liable. And so it would seem to follow that as in the latter instance the act of self-destruction is not the act of the party, it must be regarded, in a case like the present, as brought about by means which are accidental, because not the result of the concurring will of the insured.

It is to be further observed that in the policy in suit the company declares that it incurs no liability in case of death from suicide or self-inflicted injuries. Thus, it appears that the insurer took into consideration the possibility that the insured might voluntarily, and with deliberate intent,—that is, as a sane person,—take his life, and in such case the death was not to be regarded as covered by the contract, because not effected by accidental means. This is the import of this clause in the policy. But no provision is made against suicide when insane; and this also adds force to the view that the contract is fairly open to the construction contended for by the plaintiff. By the term "self-inflicted injuries," as used in the policy, was not meant injuries inflicted by the insured upon himself when insane, but injuries, self-inflicted, when capable of rational, voluntary action.

Several cases have been cited by counsel for the defendant. Among them is *Harris* v. *Travelers' Ins. Co.*, decided by the superior court of Chicago in 1868, and referred to in 7 Amer. Law. Rev. 589; but the point here involved does not seem to have been there raised. The deceased was a fireman, who was accidentally buried under a falling wall, but was soon rescued without apparent injury, and continued his work for three months, when he took poison. In a suit to recover the insurance on the ground that the accident rendered him insane, it was held that if he was insane on account of the accident, the death was too remote to be covered by the policy, which included only proximate results. It would seem that the plaintiff relied upon the original accident as a ground of recovery, and that

was held too remote. Another case cited is *Pollock* v. *United States Mut. Accident Ass'n*, 28 Alb. Law J. 518; but all that was decided in that case was that the defendant was not liable for a death by poison, because the contract so expressly provided; and in view of that provision, it made no difference whether the poison was innocently or intentionally taken. There was no question of insanity involved, and, moreover, the death was not caused by "external violence," and this was one of the prerequisites to recover, as fixed in the contract. In *Bayless* v. *Travelers' Ins. Co.*, 14 Blatchf. 144, the question of insanity did not arise, and it is on the same line, in principle, with *Pollock* v. *United States Mut. Accident Ass'n, supra.*

On the whole, my conclusion is that the death of the insured, Edward M. Crandal, resulted from bodily injuries effected through external, accidental, and violent means, within the meaning of the policy in suit.

*Second.* Still another and equally interesting question remains to be determined. The contention of the defendant is that the death in this case was caused by bodily infirmities or disease, namely, the insanity of the insured, and therefore that the plaintiff cannot recover. As has been observed, the policy provides that the company shall not be liable if the death be "caused wholly or in part by bodily infirmities or disease." The policy further recites that it is issued in consideration of the warranties made in the application for insurance, and of the premium paid; and in the application signed by the insured he makes certain statements of fact, usual in such cases, the last of which, numbered 15, is as follows:

"I am aware that this insurance will not extend to  *  *  *  any bodily injury happening directly or indirectly in consequence of disease; nor to death or disability caused wholly or in part by bodily infirmities or by disease;  *  *  * nor to any case, except when the accidental injury shall be the proximate and sole cause of disability or death."

This is not a warranty of any fact. It is, in effect, merely an admission of knowledge on the part of the insured of such limitations of liability as may be declared in the policy. As, therefore, it is to the policy we must look for those limitations, it is observable that the policy does not declare that the insurance shall not extend to any bodily injury "*happening directly or indirectly in consequence of disease;*" but only that it shall not extend "to death or disability which *may have been caused wholly or in part* by bodily infirmities or disease." This, then, is the limitation of liability to be considered, as it is expressed in the policy issued and delivered subsequently to the application for insurance, rather than the statements on the subject contained in the application. The fifteenth clause in the application is not referred to in the policy. Wherein, therefore, it differs from the written contract it is no part of the contract.

The argument of counsel for the defendant is, in brief, that insanity is a bodily infirmity or disease; that in ordinary life insur-

ance cases it is regarded and characterized by the courts as a disease, and therefore it is that insurance companies are held liable in cases of suicide when the insured was insane; further, that in the case in hand the act of self-destruction was occasioned by the insanity, and so, that within the meaning of the policy, the death was caused by disease. I was much impressed with the force of this argument, and if I may use the language of DENMAN, J., in a case hereafter referred to, "but for *Winspear* v. *Accident Ins. Co.*, 6 Q. B. Div. 42, I am not sure but that I should have thought the company were protected."

It is true that in cases upon life policies death by an insane suicide is regarded by the courts as death by disease. As it is expressed in *Eastabrook* v. *Union Mut. Life Ins. Co.*, 54 Me. 224, "death by disease is provided for by the policy. Insanity is a disease. Death which is the result of insanity is death by disease." It is to be borne in mind, however, that these and similar observations are made in a class of cases where the insurance is not special but general, and where the protection which it is intended to afford covers all diseases and disorders—other than those which may be specially excepted —which result in death. In the case of a life policy, it may not matter whether the disease of insanity or the particular act of self-destruction be regarded as the immediate cause of death. It is the life which is insured, and liability arises when death occurs, unless the death is within one of the specially excepted cases enumerated in the policy. The fact, therefore, that in such cases it is said that death which is the result of insanity is death by disease does not reach the question we have here, which is, what, under the provisions of a policy which covers accidents only, was the cause of death? In the sense of the clauses on the subject in this policy, was the death caused by disease, or by the act of violence in question? Although the words of the policy are, "caused *wholly or in part* by bodily infirmities or disease," I suppose the true inquiry is, what was the actual, proximate cause of death? For, in law, there is but one cause. That is the proximate cause, which may either directly or indirectly produce the result. If the death was caused *in part* by disease, the disease must have been *a* proximate cause of death.

"One of the most valuable *criteria* furnished us by the authorities," says Mr. Justice MILLER, in *Insurance Co.* v. *Tweed*, 7 Wall. 44, "is to ascertain whether any new cause has intervened between the fact accomplished and the alleged cause. If a new force or power has intervened, of itself sufficient to stand as the cause of the misfortune, the other must be considered as too remote." In *Insurance Co.* v. *Transportation Co.*, 12 Wall 199, it was said by Mr. Justice STRONG:

"There is undoubtedly difficulty in many cases attending the application of the maxim, *proxima causa non remota spectatur*, but none when the causes succeed each other in order of time. In such cases the rule is plain.

When one of several successive causes is sufficient to produce that effect, the law will not regard an antecedent cause of that cause, or the *causa causans*. In such a case there is no doubt which cause is the proximate one, within the meaning of the maxim. But when there is no order of succession in time,—when there are two concurrent causes of a loss,—*the predominating, efficient one* must be regarded as the proximate, when the damage done by each cannot be distinguished."

The cases most nearly in point upon the question here in judgment are *Reynolds* v. *Accidental Ins. Co.*, 22 Law T. (N. S.) 820; *Winspear* v. *Accident Ins. Co.* 6 Q. B. Div. 42; *Lawrence* v. *Accidental Ins. Co.*, 7 Q. B. Div. 216; and *Scheffer* v. *Railroad Co.*, 105 U. S. 249.

Although it may extend this opinion to greater length than is desirable, it seems necessary to give attention to these cases somewhat in detail.

In the *Reynolds Case* the facts were that Thomas Humphrey effected with the defendant company "a policy of insurance, whereby it was declared that if, during the continuance of such policy, the said Thomas Humphrey should receive or suffer bodily injury from any accident or violence, in case such accident or violence *should cause the death* of the said Thomas Humphrey within three calendar months after the occurrence of such accident or violence, the full sum of three hundred pounds should be payable to the personal representatives, etc.: provided, also, and it is hereby expressly agreed and declared, that no claim shall be payable by the said company under the policy in respect of death or injury by accident or violence, unless such death or injury shall be occasioned by some external and material cause operating upon the person of the said insured, and unless, in the case of death, as aforesaid, *such death shall take place from such accident or violence* within three calendar months," etc. It appeared that Humphrey, while the policy was in force, went into the sea to bathe. While in a pool about one foot deep he became suddenly insensible from some unexplained internal cause, and fell into the water with his face downwards. A few minutes afterwards he was found lying dead, with his face in the water, and water escaped from his lungs in such a manner as to prove that he had breathed after falling into the water. The question for the opinion of the court was whether the death of Humphrey occurred in a manner entitling the plaintiff, as his executor, to receive the sum of £300 under or by virtue of the policy. Bosanquet, for the defendant, argued that "if a man is pushed into the water, or forcibly held down in it, his death then results from violence, within the meaning of the policy. If a man accidentally falls into water, and is drowned, his death results from accident; *but if a man falls down in a fit in a shallow pool, and is drowned, his death is the result, not of accident or of violence, but of the fit,* even though the immediate cause of death be, as here, suffocation by drowning." WILLES, J., said: "In this case the death resulted from the action of the water on the lungs, and from the consequent interference with respiration. I think that *the fact of the de-*

*ceased falling in the water from sudden insensibility was an accident,* and consequently that our judgment must be for the plaintiff." It is to be observed of this case that it has only a general application to the question under consideration, because the proviso in the policy contained no such condition as we have here in relation to disease as a cause, in whole or in part, of death.

In the *Winspear Case* the facts were that W. effected an insurance with the defendants against accidental injury, and by the terms of the policy the defendants agreed to pay the amount insured to W.'s legal representatives, should he sustain "any personal injury caused by accidental, external, and visible means," and the *direct effect* of such injury should cause his death. The policy also contained a proviso that the insurance should not extend "*to any injury caused by or arising from natural disease or weakness, or exhaustion consequent upon disease,* \* \* \* *or to any death arising from disease, although such death may have been accelerated by accident.*" During the time the policy was in force, and while W. was crossing a stream, he was seized by an epileptic fit, and fell into the stream, and was drowned *while suffering from the fit,* but he did not sustain any personal injury to occasion death other than drowning. Here it was argued that there would have been no drowning had the insured not had an epileptic fit; that it was the fit which caused the drowning; and that the death, therefore, was from an injury caused by the fit; just as it is argued in the case at bar that there would have been no suicide had the insured not been insane; that it was the insanity which caused the suicide, and that, therefore, the death was from an injury caused by insanity. But Lord COLERIDGE, C. J., said:

"I am of opinion that this judgment should be affirmed, and that on very plain grounds. It appears to be clear from the statement in this case that the insured died from drowning in the waters of the brook, while in an epileptic fit, and drowning has been decided to be an injury because, in the words of this policy, caused by 'accidental, external, and visible means.' I am, therefore, of opinion that the injury from which he died was a risk covered by this policy; and the only question, then, remaining is whether the case is within the proviso which provides that the insurance 'shall not extend to death by suicide, whether felonious or otherwise, or *to any injury caused by or arising from natural disease or weakness or exhaustion consequent upon disease.*' It is certainly not within the first part of this proviso because the death was not so occasioned. Neither does it appear to me that the cause of death was within those latter words of the proviso. *The death was not caused by any natural disease, or weakness or exhaustion consequent upon disease, but by the accident of* drowning. I am of opinion that those words in the proviso mean what they say, and that they point to an injury caused by natural disease; as if, for instance, in the present case, epilepsy had really been the cause of the death. The death, however, did not arise from any such cause, and those words have no application to the case, and therefore the judgment of the exchequer division must be affirmed."

This case, in its facts and upon principle, appears to be directly in point; for if there the death was not in a legal sense caused by

the fit, but by the drowning, so here it was not caused by the insanity or disease, but by the act of self-destruction.

In the case of *Lawrence* there was a policy of insurance against death from accidental injury, which contained the following condition:

"This policy insures payment only in case of injuries accidentally occurring from material and external cause operating upon the person of the insured, where such accidental injury is the direct and sole cause of death to the insured; * * * *but it does not insure in case of death arising from fits, * * * or any disease whatever arising before or at the time or following such accidental* injury, (whether consequent upon such accidental injury or not, and whether causing such death directly or jointly with such accidental injury.)"

The insured, while at a railway station, was seized by a fit, and fell off the platform across the railway, and an engine and carriages passed over his body and killed him. The falling forward of the insured off the platform was in consequence of his being seized with a fit or sudden illness, and but for such fit or illness he would not have suffered injury and death. DENMAN, J., following the authority of *Winspear* v. *Accident Ins. Co.*, held the company liable. WILLIAMS, J., placed his concurring opinion upon the following grounds:

"The whole case depends on the true construction of the words in the proviso, because in this case the deceased person, having fallen down accidentally in a fit from the platform of the railway on to the rails, was, while lying there, accidentally run over by a train that happened at that moment unfortunately to come up, and he was undoubtedly killed by the direct external violence of the engine upon his body, which caused his death immediately. The question arises whether, according to the true construction of the proviso, it can be said that this is a case of a death arising from a fit; because, if this death did not arise from the fit, according to the true construction of the policy, the remainder of the clause does not come into existence at all, and is inapplicable. It seems to me that the well-known maxim of Lord BACON, which is applicable to all departments of the law, is directly applicable in this case. Lord BACON's language in his Maxims of the Law, reg. 1, runs thus: 'It were infinite for the law to consider the causes of causes, and their impulsions one of another; therefore it contenteth itself with the immediate cause.' Therefore I say, according to the true principle of law, I must look at only the immediate and proximate cause of death; and it seems to me to be impracticable to go back to cause upon cause, which would lead us back ultimately to the birth of the person; for had he not been born, the accident would not have happened. The true meaning of this proviso is that if the death arose from a fit, then the company are not liable, even though accidental injury contributed to the death in the sense that they were both causes which operated jointly in causing it. That is the meaning, in my opinion, of this proviso. But it is essential to that construction that it should be made out that the fit was a cause in the sense of being the proximate and immediate cause of the death, before the company are exonerated; and it is not the less so because you can show that another cause intervened and assisted in the causation."

Thus it appears that although the proviso in the policy in that case was that if the death should arise from a fit the company should not be liable, even though accidental injury contributed to the death by

operating jointly with the fit, it was nevertheless held essential to show that the fit was a cause in the sense of being the immediate cause of death, in order to exonerate the company.

*Scheffer* v. *Railroad Co., supra,* only has application here by way of analogy. In that case a passenger on a railway car was injured by a collision of trains, and, becoming thereby disordered in mind and body, he, some eight months thereafter, committed suicide. It was held, in a suit by his personal representatives against the railway company, that his own act was the proximate cause of his death, and that, therefore, there could be no recovery.

Although it may be said that Crandal would not have committed suicide had he not been insane, and so that the insanity was a promoting cause of death, upon the reasoning and authority of the cases referred to, the conclusion seems unavoidable that the act of self-destruction must be regarded, within the meaning of the policy, as the true and proximate cause of his death. Quite against my first impressions when the case was submitted, I am constrained to hold, upon deliberate consideration, that the plaintiff is entitled to recover. If I am wrong in my conclusions, it is a gratification to know that the case is one that may be taken to the supreme court for its judgment, and in which the error, if error has been committed, may be there corrected.

Judgment for plaintiff on the verdict.